UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

AL WEISS, an individual,

     Plaintiff,

v.

AT&T INC., a Delaware corporation;
and AT&T MOBILITY, LLC a/k/a
AT&T WIRELESS, a Delaware
limited liability company,

     Defendants.

_____/

Case No. _____

## COMPLAINT

Plaintiff, AL WEISS, an individual ("Plaintiff"), by and through his undersigned attorneys, hereby sues Defendants, AT&T INC., a Delaware corporation ("AT&T Inc."); and AT&T MOBILITY, LLC a/k/a AT&T WIRELESS, a Delaware limited liability company ("AT&T Mobility") (collectively, "Defendants" or "AT&T"), and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff is an individual residing and domiciled in Orange County, Florida, and is a citizen of Florida.

2.    AT&T Inc. is a Delaware corporation and has its principal place of business in Texas.  AT&T Inc. engages in substantial and not isolated activity in the State of Florida and is subject to the jurisdiction of this Court.

3.     AT&T Mobility is a Delaware limited liability company and has its principal place of business in Georgia.  AT&T Mobility engages in substantial and not isolated activity in the State of Florida and is subject to the jurisdiction of this Court.

4.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the laws of the United States of America, specifically, 28 U.S.C. § 2201 and 47 U.S.C. §§ 206, 222.

5.     This Court has supplemental jurisdiction over Plaintiff's state law claims because Plaintiff's claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in the Middle District of Florida.

7.     This action is properly filed in the Orlando Division because it is the division to which the action is most directly connected and in which the action is most conveniently advanced.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### Background

8.     At all times material to this action, Plaintiff was a customer of AT&T.

9.     AT&T Inc., as presently constituted, is the result of the recombination of many of the companies split off from the original American Telephone & Telegraph Company.

10.     AT&T Mobility, which is marketed as "AT&T," provides wireless telephone service to customers in the United States, Puerto Rico, and the U.S. Virgin Islands and currently is the second largest wireless provider in the United States.

11.     AT&T is a "common carrier" governed by the Federal Communications Act ("FCA"), 47 U.S.C. § 151 *et seq.*, and its acts and practices are regulated by the Federal Communications Commission ("FCC").

12.     AT&T markets and sells wireless telephone services through standardized wireless service plans through various retail locations, online sales, and over the telephone, including throughout the State of Florida.

13.     In connection with its wireless services, AT&T maintains wireless accounts that enable customers to access information about their AT&T services.

14.     Tens of millions of customers entrust AT&T with their mobile account information and personal data, including information that can serve as a key to unlock customers' highly sensitive personal and financial information.

15.     Recognizing the serious harm that arises when customers'

personal information is accessed, disclosed, or used without their consent, federal law requires AT&T to protect this sensitive information.

16.     In an egregious violation of the law, and despite touting itself as a leader in technological development and a cyber security-savvy company, AT&T breached its duties to Plaintiff by failing to implement and maintain adequate security measures and procedures to prevent unauthorized access to Plaintiff's account and the sensitive and confidential personal information contained therein.

17.     In June 2022, AT&T employees, representatives, or agents obtained unauthorized access to Plaintiff's AT&T mobile account, viewed his confidential and private personal information, and transferred control over Plaintiff's AT&T mobile number from Plaintiff's phone to a phone controlled by a third-party hacker.  The hacker then immediately utilized its control over Plaintiff's mobile number—control secured with necessary and direct assistance from AT&T employees, representatives, or agents—to access and steal from Plaintiff's personal and digital financial accounts.

18.     As a direct and proximate result of AT&T's systemic failure to protect Plaintiff's confidential information through adequate security and oversight systems and procedures (as mandated by law), Plaintiff has suffered hundreds of thousands of dollars in damages.

19.     All conditions precedent to the filing and maintenance of this

action have been performed, waived, or otherwise excused.

20.     Plaintiff has retained the law firm of Latham, Luna, Eden & Beaudine, LLP to represent him in this action and is obligated to pay the firm a reasonable fee for the services provided in connection therewith.

## SIM Swap Theft

21.     "SIM swapping" or "SIM hijacking" is a relatively simple type of identity theft wherein a third party takes control of a victim's mobile phone number.  The hacker then uses the phone number as a key to access and take over the victim's digital accounts, including e-mail, file storage, and financial accounts.

22.     "SIM" is the acronym for "Subscriber Identifying Module."  A SIM card stores user data in phones on the Global System for Mobile (GSM) network, which is the radio network used by AT&T to provide cellular telephone service to its customers.

23.     SIM cards principally are used to authenticate cellphone subscriptions.  Without a SIM card, GSM phones are unable to connect to telecommunications networks such as AT&T's.

24.     A SIM card is vital to using a phone on a cellular network and, in addition, is an instrumental tool for identifying the account associated with the phone.

25.     The SIM card associated with a mobile phone can be changed.  For

example, if a customer buys a new phone that requires a different sized SIM card, the customer can contact the carrier to associate his or her account with a new SIM card.

26. Before effectuating a SIM card change, a carrier is required by law to authenticate that the change request is legitimate before effectuating the change. If a carrier fails to implement and maintain adequate systems to authenticate SIM card change requests, then SIM cards can be corrupted in order to steal not only the identity of the customer but also the customer's highly confidential information.

27. AT&T, in violation of its statutory duties, does not have the requisite protective measures in place to protect its customers (including Plaintiff) because it allows its employees, representatives, and agents to conduct SIM card changes remotely and in person without adequate protections against unauthorized SIM swaps.

28. The involvement of a SIM swap victim's mobile carrier is critical to an unauthorized SIM swap. In order for an unauthorized SIM swap to occur, the carrier must activate the SIM card in the hacker's phone, which simultaneously results in the SIM card in victim's phone being deactivated.

29. There are several commonly known scenarios of unauthorized SIM card swaps that can result from a carrier's failure to implement adequate security measures to protect its customers' account information.

30.    In the most common scenario, a hacker, pretending to be the customer, contacts the carrier either by calling the carrier's customer support number or visiting a retail location and says he or she got a new phone (or lost an old one) and needs to activate a new phone.  By law, the carrier's employee, representative, or agent handling the request is required to verify the legitimacy of the request and the authentication of the requester as the actual customer.   However, if the carrier fails to maintain and enforce proper safeguards and security measures, then the employee, representative, or agent easily can authenticate the hacker's request, either because of weak verification methods (for example, questions with answers that easily can be guessed or manufactured) or through bypassing the verification process altogether, and then fulfill the unauthorized SIM swap. The strength of the carrier's internal controls and safeguards is critical to the protection of its customers' data.  Without proper training, policies, and procedures in place to verify the legitimacy of a SIM swap request and the authentication of the requestor as the actual customer, the carrier cannot protect the customer from a SIM swap theft.

31.    Similarly, a hacker can effectuate an unauthorized SIM swap by utilizing  a carrier's online self-service portal (such as the one provided by AT&T).  In this scenario, the hacker can access the customer's account simply by logging into the portal using a username and password or other simple

authorization mechanism implemented by the carrier, who typically considers this "identity verification" despite the fact that no verification occurs other than simply knowing the login occurred.  Once again, the carrier's failure to implement adequate safety measures is crucial to the hacker's ability to obtain unauthorized access to the customer's account.

32.     Unauthorized SIM swaps also can be made through the active assistance of an employee, representative, or agent of the carrier.  Under this scenario, the employee, representative, or agent uses his or her carrier-authorized login credentials to obtain unauthorized access to the customer's account and then provides the customer's personal information to the hacker.  This type of unauthorized SIM swap results from the carrier's failure to implement security measures to prevent and detect data breaches and failure to properly train and supervise its employees regarding access to and use of customers' personal information.  AT&T has been prosecuted for this very issue several times, resulting in the entry of consent decrees with the FCC (including the Consent Decree discussed *infra*).

33.     In another scenario, a hacker (or someone paid by the hacker) grabs a tablet or other mobile device used by the store's manager or employees to access personal information about customers and perform SIM card replacements as part of their normal duties.  The hacker then uses the tablet or mobile device to conduct unauthorized SIM swaps.  Without proper

measures and procedures in place to quickly identify potentially affected customers and block SIM swaps on those accounts, the carrier exposes its customers to considerable damages.

34.     After a SIM swap theft, the hacker  has control over the customer's phone number, which then allows the thief to gain control over the customer's personal online accounts, including e-mail, banking, and investment accounts, through password reset links and codes sent via text message to the now hacker-controlled phone number or through two-factor authentication processes associated with the customer's digital accounts.

35.     Two-factor authentication allows digital accounts to be accessed without a password or allows the account password to be changed.  A commonly known form of two-factor authentication—which AT&T itself uses—utilizes password reset links sent through text messaging.  Rather than enter a password, the hacker goes to the customer's online account and requests that a password reset link or code be sent via text message to the AT&T mobile phone number associated with the customer's account.  Because the hacker now controls the mobile phone number after the SIM swap theft, the reset link or code is sent to the hacker, who then can log into, and change the password for, the customer's account, thereby gaining access to and complete control over all of the contents of the customer's online accounts.

36.     In addition, SIM card swaps allow thieves to intercept calls and

messages, impersonate the AT&T customer, and perform denial of service attacks.

37.    Therefore, obtaining access to and control over the customers' mobile phone number in the first instance is a central part of obtaining control over the customer's other online accounts, such as e-mail services and financial accounts.

38.    The involvement of the carrier is critical to an unauthorized SIM swap.  In order for an unauthorized SIM swap to occur and for a carrier's customer to be at any risk, the carrier first must activate the SIM card in the hacker's phone.  The carrier's execution of the unauthorized SIM swap thus is the lynchpin to the ensuing damage to the customer.

39.    These actions—which have been widely known to AT&T and other carriers since as early as 2016—have been used to hack into social media accounts, steal cryptocurrencies, break into bank accounts, and gain access to a customer's highly confidential and sensitive information.

40.    Given the rising number of incidents of SIM card theft and the numerous cases brought against wireless service providers (including AT&T), AT&T was well-aware of the devasting losses borne by its customers resulting from SIM swap theft.  Indeed, AT&T has issued many public statements assuring customers that AT&T was exercising adequate measures to prevent unauthorized SIM swapping from happening to its customers.

41.     AT&T's employees, agents, or representatives accessed Plaintiff's AT&T mobile account without his authorization, obtained his confidential and proprietary personal information, and then transferred his account to a phone controlled by a hacker, who then immediately used its control over Plaintiff's mobile phone number to access and take control of Plaintiff's sensitive and confidential information and accounts.

42.     Despite AT&T's knowledge of the rapid rise of unauthorized SIM swapping cases—and AT&T's assurance that it actively was protecting its customers—AT&T failed to have adequate measures in place to protect Plaintiff from well-known SIM swap theft, and as a result of AT&T's systemic failure to institute and maintain adequate protective measures, Plaintiff has had hundreds of thousands of dollars of assets stolen from him, which also has resulted in adverse tax consequences.

**AT&T's Statutory Obligations to Protect Its Customers' Personal Information**

43.     AT&T, as a common carrier, is obligated to protect the confidential personal information of its customers pursuant to Section 222 of the FCA, 47 U.S.C. § 222.

44.     Section 222(a) of the FCA provides, "Every telecommunications carrier has a duty to protect the confidentiality of proprietary information ["CPI"] of, and relating to … customers …."  47 U.S.C. § 222(a).

45.    Section 222(c) provides, in relevant part, as follows:

> Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information ["CPNI"] by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.

47 U.S.C. § 222(c)(1).

46.    "CPNI" is defined as

> (A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and

> (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier;

> except that term does not include subscriber list information.

47 U.S.C. § 222(h)(1).

47.    The FCC has promulgated rules to implement Section 222 "to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI." *See In the Matter of*

*Implementation of the Telecomms. Act of 1996: Telecomm. Carriers' Use of Customer Proprietary Network Infor. & Other Customer Info.*, 22 FCC Rcd. 6927, 6982 (Apr. 2, 2007); *see also* 47 C.F.R. § 64.2001 *et seq.* (the "CPNI Rules"); *In the Matter of Implementation of the Telecomms. Act of 1996: Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, 13 FCC Rcd. 8061, 8195, ¶ 193 (Feb. 26, 1998).

48.    The CPNI Rules limit disclosure and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here.  47 C.F.R. § 64.2005.

49.    Pursuant to the CPNI Rules, "[t]elecommunications carriers must implement a system by which the status of a customer's CPNI approval can be clearly established prior to the use of CPNI."  47 C.F.R. § 64.2009(a).

50.    The CPNI Rules require carriers to implement safeguards to protect customers' CPNI, including (i) training "their personnel as to when they are and are not authorized to use CPNI"; (ii) establishing "a supervisory review process regarding carrier compliance with the rules"; and (iii) filing annual compliance certificates with the FCC.  47 C.F.R. § 64.2009(b), (d), and (e).

51.    The CPNI Rules further require carriers to implement measures to prevent the disclosure of CPNI to unauthorized individuals.  47 C.F.R. §

64.2010.  For example, "carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI" and "must properly authenticate a customer prior to disclosing CPNI based on customer-initiated telephone contact, online account access, or an in-store visit."  47 C.F.R. § 64.2010(a).

52.    In the case of in-store access to CPNI, "[a] telecommunications carrier may disclose CPNI to a customer who, at a carrier's retail location, first presents to the telecommunications carrier or its agent a valid photo ID matching the customer's account information."  47 C.F.R. § 64.2010(d).  "Valid photo ID" is defined as "a government-issued means of personal identification with a photograph such as a driver's license, passport, or comparable ID that is not expired."  47 C.F.R. § 64.2003(r).

53.    Among other things, the FCC has enacted rules to secure and protect the privacy of CPNI from unauthorized disclosure through a common social engineering ploy known as "pretexting."  *See In the Matter of Implementation of the Telecomms. Act of 1996: Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, 22 FCC Rcd. 6927, 6928 (Apr. 2, 2007) (the "Pretexting Order").

54.    The Pretexting Order defines "pretexting" as "the practice of pretending to be a particular customer or other authorized person in order to obtain access to that customer's call detail or other private communications

14

records." *Id.* at n.1.  Such "call detail" and "private communications" are considered CPI and CPNI under the FCA.  *Id.* at 6928.

55.   As the FCC noted in the Pretext Order, "pretexters have been successful at gaining unauthorized access to CPNI," and "carriers' record on protecting CPNI demonstrates that the Commission must take additional steps to protect customers from carriers that have failed to adequately protect CPNI."  *Id.* at 6933.  The FCC thus modified its rules to impose additional security requirements for carriers' disclosure of CPNI and to require carriers to inform law enforcement and customers of security breaches involving CPNI.  *Id.* at 6936-62.

56.   In the Pretexting Order, the FCC also stated it "fully expect[s] carriers to take every reasonable precaution to protect the confidentiality of proprietary or personal customer information."  *Id.* at 6959, ¶ 64.  The FCC further stated it "decline[d] to immunize carriers from possible sanction for disclosing customers' private information without appropriate authorization."  *Id.* at 6960, ¶ 66.

57.   The FCC also stressed that the fact that someone fraudulently obtained information from the carrier is strong evidence of the carrier's failure to satisfy the requirements of Section 222, stating "we hereby put carriers on notice that the Commission henceforth will infer from evidence that a pretexter has obtained unauthorized access to a customer's CPNI that the carrier did not

sufficiently protect that customer's CPNI.  A carrier then must demonstrate that the steps it has taken to protect CPNI from unauthorized disclosure, including the carrier's policies and procedures, are reasonable in light of the threat posed by pretexting and the sensitivity of the customer information at issue." *Id*. at 6959, ¶ 63.

58.   AT&T violated Section 222 of the FCA and the CPNI Rules by allowing a hacker to obtain unauthorized access to Plaintiff's AT&T account, which contained or allowed access to Plaintiff's personal information, including CPI and CPNI, without requiring the individual accessing Plaintiff's account to present valid identification or otherwise complying with the FCA and AT&T's own procedures.

59.   AT&T's continued use of weak and inadequate verification methods and continued failure to properly monitor, audit, and enforce administrative safeguards is strong evidence of AT&T's gross negligence, which has resulted in significant damage to Plaintiff due to this well-known method of theft.

60.   AT&T is familiar with, and has a repeated history of, similar incidents with thousands of customers, resulting in significant financial loss; loss of sensitive, confidential business and personal information; and extortion claims by SIM card thieves.

16

## AT&T's Privacy Policy and Code of Business Conduct

61.     In its Privacy Policy ("Privacy Policy"), AT&T expressly recognizes its obligation to protect and secure Plaintiff's CPNI, stating, "It is your right and our duty under federal law to protect the confidentiality of your CPNI." Privacy Policy at p. 29. AT&T PRIVACY POLICY, https://about.att.com/ecms/dam/csr/privacy-redesign/ATT_Privacy_Policy-220606.pdf (last visited Jan. 23, 2023).

62.     AT&T further represents it has numerous safeguards in place to protect its customers' personal data. The Privacy Policy states the following under the section titled "Security":

> We work hard to safeguard your data using a range of technological and organizational security controls.
>
> We maintain and protect the security of computer storage and network equipment, and we use security procedures that require employees to authenticate themselves to access sensitive data. We also limit access to personal information only to those with jobs requiring such access. *We require callers and online users to authenticate themselves before providing account information.* ...

Privacy Policy at p. 17 (emphasis added).

63.     Similarly, in its Code of Business Conduct (the "COBC"), AT&T represents, "We protect the privacy of our customers' communications. Not only do our customers demand this, but the law requires it. ... Maintaining the confidentiality of communications is, and always has been, a crucial part

17

of our business." AT&T CODE OF BUSINESS CONDUCT, http://cobc.att.com/customers (last visited Jan. 23, 2023).

64. In the COBC, AT&T further represents, "AT&T possesses sensitive, detailed information about our customers who rely on AT&T to safeguard that information. Laws and regulations tell us how to treat such data. Any inappropriate use of confidential customer information violates our customers' trust and may also violate a law or regulation. Preserving our customers' trust by safeguarding their private data is critical." *Id*.

65. Despite these and similar statements recognizing its obligations under the FCA, AT&T failed to provide reasonable and appropriate security measures to prevent unauthorized access to its customers' wireless accounts, leaving customers, including Plaintiff, vulnerable to SIM swap theft.

66. AT&T violated its duties and obligations to Plaintiff by failing to maintain adequate security measures to protect Plaintiff's CPNI and other private and confidential data, resulting in hundreds of thousands of dollars in damages.

### The Consent Decree Against AT&T

67. On April 8, 2015, the FCC fined AT&T a record $25 million for violating Section 222 of the FCA by allowing its employees to hand over the CPNI of almost 280,000 customers to unauthorized persons. In addition to the $25 million fine, AT&T also entered into a Consent Decree (the "Consent

Decree"). The Consent Decree is attached to and incorporated by reference in the FCC's Order reported at *In the Matter of AT&T Services, Inc.*, 30 FCC Rcd. 2808, 2816-17 (Apr. 8, 2015) (the "Adopting Order").

68. Pursuant to the Consent Decree, AT&T was required to implement measures to protect CPNI, including the following:

> (b) **Information Security Program**. Within ninety (90) calendar days after the Effective Date, AT&T shall have in place and thereafter maintain an information security program reasonably designed to protect CPNI and Personal Information from unauthorized access, use, or disclosure by Covered Employees and Covered Vendor Employees (Information Security Program). AT&T shall ensure that the Information Security Program is fully documented in writing … and includes: (i) administrative, technical, and physical safeguards reasonably designed to protect the security and confidentiality of Personal Information and CPNI; (ii) reasonable measures to protect Personal Information and CPNI maintained by or made available to Vendors, Covered Employees, and Covered Vendor Employees …; (ii) access controls reasonably designed to limit access to Personal Information and CPNI to authorized AT&T employees, agents, and Covered Vendor Employees; (iv) reasonable processes to assist AT&T in detecting and responding to suspicious or anomalous account breach, including whether by malware or otherwise, involving Covered Employees and Covered Vendor Employees; (v) a comprehensive breach response plan that will enable AT&T to fulfill its obligations under applicable laws, with regard to breach notifications ….
>
> (c) **Ongoing Monitoring and Improvement**. AT&T shall monitor its Information Security Program on an ongoing basis to ensure that it is operating in a

> manner reasonably calculated to control the risks identified through the Risk Assessment, to identify and respond to emerging risks or threats, and to comply with the requirements of Section 222 of the Act, the CPNI Rules, and this Consent Decree. To the extent that such monitoring reveals that the program is deficient or no longer reasonably fulfills this purpose, AT&T shall implement additional safeguards to address these deficiencies and gaps. …

Consent Decree at ¶¶ 18(b), (c) (Adopting Order, 30 FCC Rcd. at 2816-17).[1]

69. In the Consent Decree and the Adopting Order, the FCC highlighted AT&T's lax security practices and dismal failure to supervise and monitor employees that led to AT&T's unprecedented breach of its customers' confidential and private information.

70. For example, the FCC investigation revealed that numerous AT&T call center employees provided the CPNI of hundreds of thousands of customers, including names, phone numbers, and Social Security Numbers, to unauthorized third parties, who used this information to gain access to unlock codes for mobile telephones and to remove territorial and network restrictions. Adopting Order, 30 FCC Rcd. at 2808. The investigation further revealed employees frequently were paid by criminals to turn over AT&T customers' personal, sensitive information, including account-related CPNI. *Id*. at 2808,

---

[1] The requirements of Paragraphs 18(b) and (c) expire seven (7) years after the Effective Date of the Consent Decree. Consent Decree at ¶ 22 (Adopting Order, 30 FCC Rcd. at 2820).

2813-15.

71.     The FCC found that AT&T employees used their login credentials to access the confidential information of almost 280,000 customers and concluded that AT&T's data security measures "failed to prevent or timely detect a large and ongoing Data Breach." *Id.* at 2813.

72.     The FCC also found AT&T had not properly supervised its employees' access to its customers' personal information, including CPNI. The FCC concluded that AT&T's "failure to reasonably secure customers' proprietary information violates a carrier's statutory duty under the Communications Act to protect that information and constitutes an unjust and unreasonable practice in violation of the Act." *Id.* at 2808.

73.     In the Adopting Order, the FCC emphasized the importance of AT&T's obligation to adhere to the obligations embodied in Section 222 of the FCA, stating the purpose of Section 222 is to "ensure that consumers can trust that carriers have taken appropriate steps to ensure that unauthorized persons are not accessing, viewing or misusing their personal information." *Id.* Carriers like AT&T thus are required "to take every reasonable precaution to protect their customers' data" and to notify customers regarding any breaches in order to "aid in the pursuit and apprehension of bad actors and provide valuable information that helps affected consumers be proactive in protecting themselves in the aftermath of a data breach." *Id.* (internal quotation marks

omitted).

### AT&T's Failure to Fulfill Its Obligations and Duties to Plaintiff, Resulting in SIM Card Theft and Damages

74.     Pursuant to applicable law, as well as the obligations set forth in the Consent Decree, AT&T had a duty to protect Plaintiff and his personal information, including CPNI,  through proper administrative controls, identity verification, and authentication mechanisms.

75.     In contravention of the requirements of the FCA and CPNI Rules, as well as the obligations imposed by the FCC in the Consent Decree, AT&T failed to implement and ensure compliance with adequate security procedures and controls to protect Plaintiff's personal information, including CPNI.

76.     In the instant matter, AT&T—whether acting as a co-conspirator to the theft or through abject negligence—transferred Plaintiff's AT&T telephone number to a SIM card thief, which directly led to the theft of hundreds of thousands of dollars of Plaintiff's assets, including cryptocurrency assets, and attendant tax liability.

77.     On some unknown date prior to June 23, 2022, an unauthorized person contacted AT&T to orchestrate a SIM swap of Plaintiff's wireless telephone number.

78.     Without properly verifying the person's identification, AT&T transferred Plaintiff's wireless telephone number to the unauthorized person,

disconnecting the telephone number from Plaintiff's wireless phone's SIM card and then connecting the telephone number to a SIM card under the control of the unauthorized person.

79.     On or about June 23, 2022, Plaintiff noticed that his cell phone was unable to connect to the AT&T cellular network.

80.     Plaintiff immediately went to an AT&T branch store in Orlando, Florida as soon it opened.  AT&T told Plaintiff the SIM card must be defective and replaced it but did nothing to investigate further.  AT&T did not notify Plaintiff that there could have been a security breach.

81.     Later that morning, Plaintiff was contacted by the SIM card thief during a Zoom conducted business meeting, who proceeded to extort Plaintiff. The thief stated he knew Plaintiff was a high-profile executive and threatened that all of Plaintiff's confidential e-mails and other personal information would be made public and that Plaintiff's family would be sorry unless Plaintiff paid exorbitant sums of money to the thief.

82.     Upon further investigation, Plaintiff then learned that his cryptocurrency wallet and his accounts at several major cryptocurrency exchanges had been compromised and that hundreds of thousands of dollars in cryptocurrency assets had been stolen from his accounts.

83.     The theft from Plaintiff would not have occurred but for AT&T's failure to adequately protect Plaintiff's AT&T account and maintain proper

security measures to prevent the unauthorized SIM swap that took place.

84.    Due to its wholly inadequate procedures, practices, and policies, AT&T fails to provide reasonable and appropriate security to prevent unauthorized access to its customers' wireless accounts and allows unauthorized persons to be authenticated and make SIM card swaps, which results in hackers obtaining  access to sensitive customer wireless account data, including CPNI and CPI, and control over the customers' financial and other accounts.

85.    In particular, AT&T has failed to establish, implement, and monitor reasonable policies, procedures, and safeguards governing the creation and authentication of user credentials for authorized customers accessing AT&T accounts to ensure only authorized users can access private and confidential account information, thus creating an unreasonable risk of unauthorized access to protected information, including CPNI and CPI.

86.    Among other things, AT&T failed to

(a)    establish or enforce rules sufficient to ensure only authorized persons have access to AT&T customer accounts;

(b)    establish appropriate rules, policies, and procedures for the supervision and control of its employees, representatives, and agents regarding access to and disclosure of AT&T customer accounts and protected information;

24

(c)     establish and enforce rules, and provide adequate supervision and training, sufficient to ensure its employees, representatives, and agents adhere to rules, policies, and procedures regarding access to and disclosure of AT&T customer accounts and protected information;

(d)     adequately safeguard and protect its customers' wireless accounts, including Plaintiff's, from unauthorized account access or porting of telephone numbers without proper authentication and verification;

(e)     take appropriate measures to detect suspicious or abnormal account activity and suspend user credentials when such suspicious or abnormal activity occurs or is suspected;

(f)     adequately train and supervise its employees, representatives, and agents in such a manner so as to prevent unilateral access and changes to customer accounts without proper authentication and verification;

(g)     implement simple, low-cost, and readily-available mechanisms to limit damage caused by identity thieves, such as delaying transfers from accounts on which passwords recently were changed or simply delaying transfers from accounts to allow for additional verifications from customers; and

(h)     build adequate internal tools to help protect its customers against hackers and account takeovers, including compromise through phone

25

porting and wrongdoing by its own agents or employees acting on their own behalf or on behalf or at the request of a third party.

87.    AT&T's inadequate security practices and procedures created a foreseeable and unreasonable risk of unauthorized access to customer accounts, including Plaintiff's.

88.    AT&T was aware of the unreasonable risks created by its inadequate practices and procedures, as AT&T customers have been subject to other incidents of SIM card swap theft, including incidents involving prominent members of the cryptocurrency community.

89.    AT&T likewise is aware that its employees have and can be complicit in such fraud and can bypass AT&T's security measures due to inadequate monitoring and enforcement and weak internal controls and security measures.

90.    As such, AT&T's security measures were entirely inadequate to protect its customers, including Plaintiff, and enabled the unauthorized access to Plaintiff's wireless account, which then directly enabled the unauthorized person to access Plaintiff's financial and other accounts and other sensitive, private information, including CPNI and CPI.

91.    AT&T breached its duties to Plaintiff by failing to implement, monitor, and enforce necessary protections for its customers, including Plaintiff, in direct violation of federal and state law and the conditions of its

previous Consent Order.

92.     AT&T breached its duties with the full knowledge of the risks associated with unauthorized SIM swapping, which has become such a well-known and widespread problem that the FCC has adopted new rules for the protection of carriers' customers.

93.     As a direct and proximate result of the foregoing acts, errors, and omissions by AT&T, Plaintiff has been damaged.

## COUNT I
## DECLARATORY JUDGMENT
## (ARBITRABILITY OF DISPUTE)

94.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 93 above as though fully set forth herein.

95.     This is an action for a declaratory judgment as authorized by 28 U.S.C. § 2201.

96.     Plaintiff has brought this action seeking damages resulting from AT&T's breach of its statutory obligations to protect Plaintiff, as described above.

97.     At the time of the unauthorized SIM swap, AT&T had posted on its website an AT&T Consumer Service Agreement (the "Agreement").  A copy of the Agreement is attached as **Exhibit "A."**

98.     The Agreement contains a section entitled "Dispute Resolution by Binding Arbitration" (the "Arbitration Provision").  Agreement at § 1.3.

99.     An actual case or controversy exists between Plaintiff and AT&T concerning each party's rights and obligations under the Agreement and, in particular, with respect to the parties' rights and obligations under the Arbitration Provision.

100.    Plaintiff does not believe that the claims asserted in this Complaint fall within the scope of the Arbitration Provision.

101.    Section 1.1 of the Agreement states, in pertinent part, as follows:

> The AT&T affiliated companies, assignees, and successors ("AT&T") offers many products and services.  This Agreement contains the terms and conditions for the products and services listed below ("AT&T Services" or "Services"), including a set of universal terms ("General Terms") and specific product terms ("Service Terms").  …

102.    Plaintiff's claims do not arise out of or relate to the provision of products and services as described in the Agreement.  Rather, Plaintiff's claims are based on AT&T's systemic failure to implement and maintain adequate security measures and safeguards as required under the FCA and the CPNI Rules, which has resulted in hundreds of thousands of dollars in damages to Plaintiff.

103.    Plaintiff's claims do not depend on the interpretation or even existence of the Agreement, as Plaintiff's claims could be maintained even in the absence of any agreement between Plaintiff and AT&T given the requirements of federal and state law regarding the obligation of carriers such

28

as AT&T to protect its customers' sensitive personal information.

104.   Plaintiff does not believe that the claims asserted in this Complaint fall within the scope of either the Agreement or the Arbitration Provision.  However, because the Arbitration Provision states it "is intended to be broadly interpreted," Plaintiff is uncertain of his legal rights and interests under the Arbitration Provision and whether the claims described in this Complaint must be submitted to arbitration.

105.   The "Arbitration Procedure" section of the Arbitration Provision provides that "issues relating to the scope and enforceability of the arbitration provision or whether a dispute can or must be brought in arbitration are for the court to decide.  …" Agreement at § 1.3.2.3.

106.   Accordingly, pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaration from this Court determining whether Plaintiff's claims asserted herein are outside the scope of the Arbitration Provision and thus may be maintained in this Court.

**WHEREFORE**, Plaintiff respectfully requests that the Court (a) declare the rights and other legal relations of the parties regarding whether Plaintiff's claims must be submitted to arbitration; (b) award Plaintiff the costs of this action; and (c) grant such other and further relief as the Court deems proper.

**COUNT II**
**DECLARATORY JUDGMENT**
**(UNENFORCEABILITY OF AT&T CONSUMER AGREEMENT AS**

## UNCONSCIONABLE AND CONTRARY TO PUBLIC POLICY)

107.   Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 93 above as though fully set forth herein.

108.   At the time of the unauthorized SIM swap, AT&T had posted on its website an AT&T Consumer Service Agreement (the "Agreement").  A copy of the Agreement is attached as **Exhibit "A."**

109.   This is an action for a declaratory judgment as authorized by 28 U.S.C. § 2201 to have the Court declare that the Agreement is unconscionable, void against public policy, and unenforceable in its entirety.

110.   The Agreement was presented to Plaintiff, like all other wireless users, on a take-it-or-leave-it basis.  Plaintiff had no ability to negotiate any term of the Agreement.  In contrast, AT&T has virtually unlimited power over its customers, including Plaintiff.

111.   The Agreement contains numerous unconscionable terms that render it unenforceable in its entirety because its provisions violate federal and state law.

112.   Section 1.1 of the Agreement, titled "Our Agreement," provides as follows:

> The AT&T affiliated companies, assignees and successors ("AT&T") offer many products and services. This Agreement contains the terms and conditions for the products and services listed below ("AT&T Services" or "Services"), including a set of universal

terms ("General Terms") and specific product terms ("Service Terms"). You are bound by the General Terms and the Service Terms for each AT&T Service you purchase or use. In addition, your Agreement incorporates and includes AT&T's Privacy Policy (located at att.com/privacy), Acceptable Use Policy (located at att.com/legal/term.aup.html), and any other documents specifically referenced in the applicable Service Terms. In the event of a conflict between the General Terms and the applicable Service Terms, the Service Terms control.

If you are an existing customer, this Agreement replaces the Wireless Customer Agreement, Terms of Service and Plan Terms for AT&T PREPAID, Data Services Agreement, AT&T Phone terms of service (VOIP), Fixed Wireless Service Terms, and AT&T Internet Terms of Service.

Please use the links below to view the General Terms and Service Terms for your products and services:

- General Terms

- AT&T Wireless Services (including FirstNet Subscriber Paid User services)

- AT&T Phone

- AT&T Internet Service (including AT&T Fiber, AT&T Internet, AT&T Fixed Wireless, AT&T Wireless Home Internet and AT&T DSL)

113. The fact that the Agreement incorporates other documents that can be accessed online means the Agreement can be changed at any time and thus unknown to Plaintiff at the time of entry into the Agreement. It is unconscionable to bind all wireless customers, whether or not such customers have seen the Agreement or are aware of terms that unilaterally can be

31

changed.  Customers cannot be bound by new terms of which they did not know and to which they did not agree.  This practice evidences the fact of a non-arm's length transaction, lack of bargaining power, and even lack of knowledge of the terms to which the customer agreed.

114.   The Agreement not only is a classic contract of adhesion imposed by AT&T upon a party with no bargaining power but also gives AT&T complete discretionary control to mandate terms not included in the Agreement itself.

115.   The Agreement also is void as against public policy as a contract of adhesion purporting to bind customers who have never read or seen the agreement and most likely are entirely unaware of its provisions.

116.   The Agreement is void and unenforceable in its entirety because it contains complete waivers and exculpatory language insulating AT&T from its own negligence in carrying out the duties required under federal and state law, as well as an indemnification provision that purports to prevent customers from bringing any claims against AT&T or obtaining redress for their claims, even for billing errors.

117.   The disclaimer provision in Paragraph 1.6 of the Agreement (the "Disclaimer Provision") contains numerous provisions that are contrary to the FCA and against public policy, as they attempt to exempt AT&T from responsibility for its own gross negligence, fraud, and violations of state and federal law.  The Disclaimer Provision provides, in pertinent part, as follows:

Other than as expressly set out in these General Terms or the applicable Service Terms, AT&T Services are provided on an "as is" and "as available" basis, without warranties or guaranties of any kind. To the greatest extent permitted by law, AT&T and its parents, subsidiaries, and affiliates, and their past, present, and future officers, employees, agents, partners, licensors, successors, and assigns, expressly disclaim all warranties of any kind, whether oral, express, implied, or statutory, including but not limited to the implied warranties of title, merchantability, fitness for a particular purpose, non-infringement, and any warranties implied by a course of performance, course of dealing, or usage of trade. No one is authorized to make warranties on our behalf. We do not guarantee that AT&T Services will meet your requirements, be of a particular quality or speed, or will be uninterrupted, accurate, secure, maintained, and kept free from viruses or other harmful components. We cannot and do not guarantee that an unauthorized person won't obtain access to your AT&T Account. Nor do we guarantee that AT&T Services are suitable for use in situations in which absolutely accurate data transmission or security is required or that could result in personal injury, property damage, or financial loss. We also do not guarantee that AT&T Services will be interoperable with your hardware or software and that incompatibility won't lead to damage or loss of data. You're using AT&T Services at your own risk.

118.  Further, under Section 1.7 of the Agreement, titled "Limitations of Liability" (the "Limitations Provision"), AT&T, in contravention of state and federal law, removes all responsibility for its negligence in allowing SIM card theft to occur. The Agreement states, in pertinent part, as follows:

[Y]ou understand and accept that we have no control over the acts and conduct of third parties and that

33

you are in the best position to safeguard your personal information and protect your AT&T Accounts from unauthorized access. AT&T provides telecommunications services and you agree that AT&T is not responsible for losses incurred as a result of your or a third party's use of your AT&T wireless number or other AT&T Service as a source of authentication or verification in connection with any social media, email, financial, cryptocurrency or other account. … Accordingly, to the greatest extent permitted by law, AT&T and its parents, subsidiaries, and affiliates, and their past, present, and future officers, employees, agents, partners, licensors, successors, and assigns are not liable to you … for any indirect, incidental, special, consequential, treble, punitive, or exemplary damages for any reason. Disallowed damages including, but not are limited to, damages … resulting from, for example: … (c) the actions or inaction of AT&T or its agents with respect to the provision or delivery of any AT&T Services or that relate to your AT&T Account or our relationship with you; or (d) any action of a third party, such as unauthorized access to your AT&T Accounts or AT&T Services (including the use of your AT&T Accounts or AT&T Services to access a third-party account); or (e) any alleged actions or representations, statements, promises, or agreements by AT&T or its agents that are not expressly set forth in this Agreement regarding the use, performance, suitability, safety, reliability, security, or any other aspect or attribute of AT&T Services.

In addition, to the greatest extent permitted by law, AT&T and its parents, subsidiaries, and affiliates, and their past, present, and future officers, employees, agents, partners, licensors, successors, and assigns are not liable to you for any damages of any kind resulting in any way from … (b) any unauthorized access to your AT&T Accounts or

AT&T Services (including the use of your AT&T Accounts or AT&T Services to access a third-party account), even if the unauthorized access was the result of ordinary NEGLIGENCE by an AT&T employee, representative, agent, or any person or entity purporting to act on AT&T's behalf ….

119.   These exculpatory provisions render the entire Agreement unenforceable on public policy grounds because they purport to exempt AT&T from its own gross negligence, statutory violations, and willful behavior, including the egregious conduct alleged herein.

120.   The Disclaimer Provision and the Limitations Provision also are against public policy because they purport to excuse AT&T from liability for violating its statutory obligations, including the obligation to maintain the confidentiality and security of its customers' private and personal information under Section 222 of the FCA.

121.   Thus, even where, as here, AT&T willfully violates its statutory duties under the FCA, a customer is prevented from bringing a claim for negligent or willful disclosure of the customer's personal information, including CPNI, because such claim seeks redress for damages caused by "any action of a third party, such as unauthorized access to your AT&T Accounts or AT&T Services (including the use of your AT&T Accounts or AT&T Services to access a third-party account)."

122.   AT&T also seeks in the Agreement to have customers waive any

damages, except "a credit or refund that shall not exceed the total amount of damages you paid us for the applicable AT&T Service …."  Agreement at § 1.7.

123.   The Disclaimer Provision and the Limitations Provision are invalid because they allocate all of the risks to the consumer with AT&T disclaiming any damages for its own conduct—even fraud, gross negligence, and statutory violations, including those governed by the FCA.

124.   This unconscionable agreement would allow AT&T knowingly and willfully to allow SIM card theft (and the unauthorized disclosure of a customer's CPNI to hackers), in violation of Section 222 of the FCA, but the customer would not be entitled to the full range of damages afforded under the FCA, undermining the protective purposes of the FCA.

125.   The Disclaimer Provision and the Limitation Provision, which are included in a contract of adhesion as to which AT&T's users (including Plaintiff) have no bargaining authority, render the Agreement void as plainly unconscionable and against public policy.

126.   In particular, the Disclaimer Provision and the Limitations Provision are contained in a lengthy form contract drafted by a domineering telecommunications provider with vast assets in a far superior bargaining position than the customer.  Indeed, the consumer has no bargaining power with regard to AT&T, particularly as to the Disclaimer Provision, the Limitations Provision, and other draconian provisions in the Agreement.

Moreover, because the provisions are found within a document posted on a website that automatically is made applicable to all customers (including any subsequent changes thereto), the customers may not even be aware they have virtually no redress against AT&T, unless they diligently monitor changes on the website and the numerous form documents contained therein.

127. In addition, the Disclaimer Provision and the Limitations Provision are contained in a complex and lengthy contract that provides essential wireless services, without which most customers would have no means of communication (including for emergency services), let alone essential computing, geolocation, texting, research, or other services.

128. The Agreement also is substantively unconscionable because it allocates risks in an objectively unreasonable manner.

129. The allocation of risks under the Agreement is objectively unreasonable because AT&T—a telecommunications behemoth with billions of dollars of assets and tens of millions of customers—takes upon itself virtually no liability (other than minimal recompense for interrupted services) and purports to exempt itself from virtually all damages, including those arising out of its own deliberate, grossly negligent, or fraudulent acts, in violation of federal law.

130. The Agreement further is unenforceable because customers are purportedly required to indemnify AT&T for all claims arising out of the

services provided by AT&T, including claims that arise due to AT&T's own negligence, gross negligence, deliberate conduct, or statutory violations.

131.   Section 1.8 of the Agreement, titled "Indemnity" (the "Indemnity Provision"), states as follows:

> To the full extent allowed by law, you agree to release, hold harmless, and defend AT&T and its parents, subsidiaries, and affiliates, and their past, present, and future officers, employees, agents, partners, licensors, and successors and assigns from any and all claims of any person or entity for damages, fines, penalties, or expenses of any nature arising out of or relating to, directly or indirectly … any other claim, demand, action, or complaint by any person or entity claiming by or through you or your Authorized Users that in any way arises out of or relates to this Agreement or any AT&T Service.

132.   Read literally, the Indemnity Provision requires a consumer such as Plaintiff to hold AT&T harmless for AT&T's own negligence, deliberate behavior, gross negligence, statutory violations (including disclosure of CPNI under the FCA), and fraud if the conduct "in any way arises out of or relates to this Agreement or any AT&T Service."

133.   On its face, the Indemnity Provision renders the entire Agreement unconscionable and unenforceable because it defeats the entire purpose of the contract by making it impossible for consumers to bring claims against AT&T for the entire range of statutory rights to which a consumer such as Plaintiff is entitled under federal law.

134.   Indeed, the Indemnity Provision would obviate AT&T's legal obligations under the FCA, the CPNI Rules, and the Consent Decree.

135.   Because the entire Agreement is unenforceable—as the central purpose of the Agreement is tainted with illegality and as a whole cannot be enforced—the arbitration provision in Paragraph 1.3 of the Agreement (the "Arbitration Provision") also is enforceable.

136.   The Arbitration Provision would require Plaintiff to arbitrate his claims without being afforded the full range of statutory remedies available for the claims asserted herein, including attorneys' fees and punitive damages, due to the broad damage limitations and waivers contained in the Agreement.

137.   These defects render not only the Arbitration Provision but also the entire Agreement unenforceable.

138.   Because the defenses raised by Plaintiff as to the unconscionability of the Agreement are "enforced evenhandedly" and do not "interfere[] with the fundamental attributes of arbitration," they do not run afoul of *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2010).  The Court's decision in *Concepcion* did not abrogate the savings clause of the Federal Arbitration Act that provides arbitration agreements may be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract," including "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Concepcion*, 563 U.S. at 339 (quoting 9 U.S.C. § 2; *Drs. Assocs., Inc. v.*

*Casarotto*, 517 U.S. 681, 687 (1996))).  As alleged herein, such defenses apply squarely to the Agreement.

139.   There is an actionable and justiciable controversy between Plaintiff and AT&T in that Plaintiff contends the Agreement, including the provisions cited above, is unenforceable in its entirety because it is unconscionable and void against public policy in that it prevents consumers such as Plaintiff from obtaining redress against AT&T even for deliberate acts in violation of AT&T's statutory duties.

140.   Plaintiff is in doubt as to his legal rights under the Agreement, and a judicial declaration of the enforceability of the entire Agreement, including the Arbitration Provision, is necessary and appropriate.

**WHEREFORE**, Plaintiff respectfully requests that the Court (a) declare the rights and other legal relations of the parties regarding whether the Agreement in its entirety is unenforceable; (b) award Plaintiff the costs of this action; and (c) grant such other and further relief as the Court deems proper

**COUNT III**
**VIOLATION OF FEDERAL COMMUNICATIONS ACT**
**[47 U.S.C. §§ 206, 222]**
**(UNAUTHORIZED DISCLOSURE OF CPNI AND CPI)**

141.   Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 93 above as though fully set forth herein.

142.   AT&T is a "common carrier" engaging in interstate commerce by

wire regulated by the FCA and subject to the requirements, of, *inter alia*, Sections 206 and 222 of the FCA.

143.   Pursuant to Section 206 of the FCA, "[i]n case any common carriers shall do, or cause or permit it to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."  47 U.S.C. § 206.

144.   Section 222(a) of the FCA requires every telecommunications carrier to protect, among other things, the confidentiality of proprietary information of, and relating to, customers.  47 U.S.C. § 222(a).

145.   Section 222(c)(1) of the FCA further provides, "Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such

41

telecommunication service, including the publishing of directories." 47 U.S.C. § 222(c)(1).

146.   The information disclosed to an unauthorized person by AT&T in connection with the SIM card swap fraud, which transferred Plaintiff's telephone number to a hacker, was CPI and CPNI under Section 222 of the FCA.

147.   In violation of the FCA, AT&T failed to protect the confidentiality of Plaintiff's CPI and CPNI, including his wireless telephone number, account information, and private communications, by divulging such information to an unauthorized person without the notice, consent, and legal authorization required under the FCA

148.   Through AT&T's negligence, gross negligence, and deliberate acts, including its inexplicable failure to maintain and/or follow adequate security procedures, and by allowing its employees to bypass such procedures, AT&T permitted a hacker to access Plaintiff's telephone number, telephone calls, text messages, and account information and steal hundreds of thousands of dollars' worth of his cryptocurrency assets.

149.   As a direct result of AT&T's violations of the FCA, Plaintiff has suffered, and continues to suffer, damages.

150.   Pursuant to the 47 U.S.C. § 206, Plaintiff is entitled to recover his attorney's fees from AT&T.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment in favor of Plaintiff and against AT&T awarding Plaintiff (a) damages; (b) interest; (c) attorneys' fees and the costs of this action; and (d) such other and further relief as the Court deems proper

## COUNT IV
## NEGLIGENCE

151.   Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 93 above as though fully set forth herein.

152.   AT&T owed a duty to Plaintiff to exercise reasonable care in safeguarding and protecting Plaintiff's personal information, including CPI and CPNI, and to keep same from being compromised, lost, stolen, misused and/or disclosed to unauthorized parties.

153.   This duty included, among other things, adopting, implementing, and maintain adequate security measures to ensure that Plaintiff's personal information, including CPI and CPNI, was adequately secured and protected and was used, accessed, or disclosed only with proper consent and authorization.

154.   AT&T likewise owed a duty to Plaintiff to implement a system to safeguard against and detect unauthorized access to Plaintiff's data in a timely manner.

155.   AT&T had a special relationship with Plaintiff due to its status as

Plaintiff's telecommunications carrier, which provided an independent duty of care. AT&T had the unique ability to protect its systems and the data stored thereon from unauthorized access.

156. AT&T breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's personal information, including CPI and CPNI, by failing to adopt, implement, and maintain adequate security measures to safeguard that information.

157. Among other things, AT&T failed to protect Plaintiff from unauthorized use of CPNI by permitting its employees, representatives, and agents to use and disclose Plaintiff's CPNI without obtaining Plaintiff's knowing consent beforehand. ATT's employees, representatives, and agents, acting within the scope of their employment and agency, likewise did not seek Plaintiff's knowing consent before using, disclosing, and permitting access to Plaintiff's CPNI and facilitating an unauthorized SIM card transfer.

158. AT&T failed to take reasonable steps to protect Plaintiff's CPNI, thereby allowing a third-party hacker to access his CPNI and further failed to inform Plaintiff that a security breach had occurred.

159. By failing to secure Plaintiff's account and protect the confidential and sensitive data contained therein, and to properly hire, train, and supervise its employees, representatives, and agents, AT&T is responsible for the foreseeable harm Plaintiff suffered as a result of Plaintiff's gross negligence.

160. Further, AT&T is responsible for its employees, representatives, and agents' failure to obtain Plaintiff's valid consent before accessing his account and effectuating a SIM swap, as such actions were within the scope of their employment or agency with AT&T.

161. AT&T failed to put in place adequate measures and procedures to prevent unauthorized access to Plaintiff's account and related data and failed to properly hire and supervise its employees, representatives, and agents.

162. AT&T further failed to establish a consent mechanism that verified proper authorization before Plaintiff's information was accessed and used and then disclosed to third parties.

163. AT&T's failure to comply with federal and state law regarding adequate security measures is further evidence of AT&T's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's personal information, including CPI and CPNI.

164. But for AT&T's breach of its duties owed to Plaintiff, Plaintiff's personal information, including his CPI and CPNI, would not have been compromised, stolen, viewed, or used by unauthorized persons.

165. AT&T's negligent conduct provided the means for unauthorized individuals to access Plaintiff's account data, take over control of his mobile phone number, and use such access to control numerous online accounts.

166. AT&T's negligence was a direct and legal cause of the theft and

unauthorized access of Plaintiff's personal information and the resulting damages to Plaintiff, including, but not limited to, the theft of hundreds of thousands of dollars of cryptocurrency assets.

167. The injury and harm suffered by Plaintiff was the reasonably foreseeable result of AT&T's failure to exercise reasonable care in safeguarding and protecting Plaintiff's personal information, including his CPI and CPNI.

168. AT&T has known for over a decade that third parties frequently attempt to access and take over mobile customers' accounts for fraudulent purposes, as highlighted by the CPNI Rules and the Consent Decree. AT&T likewise knew that inadequate procedures and systems to safeguard customer data could allow its employees, representatives, and agents to improperly access customers' account and data.

169. AT&T therefore was well aware of the significant risk that unauthorized SIM swapping presented to its customers and the need to mitigate such risks—particularly in light of AT&T's history of unauthorized access to customer accounts by its employees, representatives, and agents, as detailed in the Consent Decree—but nevertheless failed to take adequate steps to protect Plaintiff

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment in favor of Plaintiff and against AT&T awarding Plaintiff (a) damages; (b) interest; (c) the costs of this action; and (d) such other and further

relief as the Court deems proper.

**COUNT V**
**NEGLIGENT TRAINING AND SUPERVISION**

170. Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 93 above as though fully set forth herein.

171. AT&T, as a telecommunications carrier, owed Plaintiff a duty to exercise reasonable care in supervising and training its employees to safeguard and protect Plaintiff's personal information, including CPI and CPNI, and to keep such information from being compromised, lost, stolen, misused and/or disclosed to unauthorized persons.

172. For example, 47 C.F.R. § 64.2009(b) requires telecommunications carriers to "train their personnel as to when they are and are not authorized to use CPNI" and to "have an express disciplinary process in place."

173. AT&T was aware its employees were able to bypass AT&T's security measures and further was aware that its employees actively participated in fraud involving AT&T's customers, including pretexting and SIM card swap fraud, by bypassing such security measures.

174. AT&T knew that Plaintiff's personal information, including CPI and CPNI, was confidential and sensitive.

175. AT&T further knew that Plaintiff's personal information was vulnerable to hacks and SIM swap fraud.

176.   AT&T breached its duty to supervise and train its employees to safeguard and protect Plaintiff's personal information, including CPI and CPNI, by not requiring its employees to adhere to AT&T's obligations under the FCA, the CPNI Rules, and the Consent Decree and failed to otherwise ensure that its employees adhered to adequate security measures to protect consumers' personal information.

177.   AT&T gave its employees, representatives, and agents the tools and opportunities they needed to gain unauthorized access to Plaintiff's account and failed to prevent such actions, thereby allowing them to use AT&T's systems to perpetuate privacy breaches and theft against Plaintiff.

178.   The fact that Plaintiff's account was accessed and his SIM card was transferred without his authorization demonstrates AT&T's failures in this regard.

179.   AT&T's failure to comply with the Consent Decree and to follow the requirements of the FCA and CPNI Rules further evidence AT&T's negligence in failing to adequately supervise and monitor its employees to ensure they would safeguard and protect Plaintiff's personal information, including CPI and CPNI.

180.   But for AT&T's breach of its duties to supervise and monitor its employees, Plaintiff's CPI and CPNI would not have been disclosed to unauthorized individuals through SIM card swap fraud.

181.  AT&T's negligence was the direct and legal cause of the theft of Plaintiff's personal information and the resulting damages, including, but not limited to, the theft of hundreds of thousands of dollars' worth of cryptocurrency.

182.  The injury and harm suffered by Plaintiff was the reasonably foreseeable result of AT&T's failure to supervise and monitor its employees in safeguarding and protecting Plaintiff's personal information, including his CPI and CPNI.

183.  In 2015, AT&T faced an FCC enforcement action and paid a $25 million civil penalty for nearly identical failures to protect its customers' sensitive account data.  As set forth in the Adopting Order and the Consent Decree, AT&T's employees, representatives, and agents improperly used login credentials to access customer accounts and customer information that could be used to unlock the customers' devices and then sold the information they obtained from these breaches to third parties.

184.  The FCC enforcement action that culminated in the Consent Decree underscores AT&T's knowledge of the risks its employees presented to customers, the prevalence of employee breaches of customer data, the sensitive nature of CPNI and CPI, and its duties to protect and safeguard that data.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment in favor of Plaintiff and against AT&T awarding Plaintiff (a)

damages; (b) interest; (c) the costs of this action; and (d) such other and further relief as the Court deems proper.

## COUNT VI
## BREACH OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201 ET SEQ.

185.   Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 93 above as though fully set forth herein.

186.   The Florida Deceptive and Unfair Trade Practices Act, Chapter 501, *Florida Statutes* ("FDUTPA"), renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Fla. Stat. § 501.204.

187.   At all relevant times, AT&T solicited, advertised, offered, and provided goods and services in the State of Florida and thereby was engaged in trade or commerce as defined in Section 501.203, *Florida Statutes*.

188.   At all relevant times, Plaintiff was a consumer as defined by Section 501.203, *Florida Statutes*.

189.   AT&T's practices, as described in detail above, are unfair, unconscionable, and/or deceptive.

190.   As a result of AT&T's unfair, unconscionable, and/or deceptive practices, Plaintiff has been damaged.

191.   Plaintiff is entitled to recover his reasonable attorneys' fees and costs from AT&T pursuant to Section 501.2105, *Florida Statutes*.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter a judgment in favor of Plaintiff and against AT&T awarding Plaintiff (a) damages; (b) interest; (c) attorney's fees and the costs of this action; and (d) such other and further relief as the Court deems proper.

## DESIGNATION OF LEAD COUNSEL

Pursuant to Local Rule 2.02(a), Plaintiff hereby designates Jennifer S. Eden, Esq., of the law firm Latham, Luna, Eden & Beaudine, LLP, as lead counsel.

Dated: January 23, 2023.

/s/ *Jennifer S. Eden*

**Jennifer S. Eden, Esq.**
Florida Bar No. 0867594
jeden@lathamluna.com
**Christina Y. Taylor, Esq.**
Florida Bar No. 0057616
ctaylor@lathamluna.com
LATHAM, LUNA, EDEN & BEAUDINE, LLP
201 S. Orange Avenue, Suite 1400
Orlando, FL 32801
Telephone: (407) 481.5800
Facsimile: (407) 481.5801

*Attorneys for Plaintiff*